UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ERICKA M. HUGHES                        CIVIL ACTION NO. 6:21-cv-02277

VERSUS                                  JUDGE JOSEPH

COMMISSIONER OF THE SOCIAL              MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, and for the reasons set forth below, it is recommended that the Commissioner's decision should be affirmed.

## Administrative Proceedings

The claimant, Ericka M. Hughes, fully exhausted her administrative remedies before initiating this action. She filed an application for disability insurance benefits, alleging disability beginning on July 12, 2018,[1] which was denied.[2] She then requested a hearing, which was held on December 14, 2020, before Administrative Law Judge Steven Rachal.[3] The ALJ issued a decision on January 25, 2021,

---

[1]     Rec. Doc. 12-1 at 157.

[2]     Rec. Doc. 12-1 at 66.

[3]     Rec. Doc. 12-1 at 32-64.

concluding that Ms. Hughes was not disabled within the meaning of the Social Security Act from July 12, 2018, through the date of the decision.[4]  Ms. Hughes asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[6]  Ms. Hughes now seeks judicial review of the Commissioner's decision.

## **Summary of Pertinent Facts**

Ms. Hughes was born on January 22, 1974,[7] and was forty-seven years old at the time of the ALJ's decision.  She graduated from high school, completed a cosmetology course, acquired a chauffer's driver's license,[8] and worked as a hair stylist and delivery driver.[9]  She alleged that became disabled on July 12, 2018, due to asthma, pinched nerves, and left foot Achilles tendonitis.[10]

---

[4]    Rec. Doc. 12-1 at 24.

[5]    Rec. Doc. 12-1 at 5.

[6]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]    Rec. Doc. 12-1 at 157.

[8]    Rec. Doc. 12-1 at 36, 181.

[9]    Rec. Doc. 12-1 at 36-41, 192.

[10]    Rec. Doc. 12-1 at 67, 180.

Ms. Hughes's primary care physician from 2017 to 2019 was Randy Daigle.[11] His records evidence complaints of low back and foot pain. Ms. Hughes also treated with Dr. Jonathan B. Purdy, DPM, from October 2017 through October 2019[12] for plantar fasciitis, ankle sprain, Achilles tendonitis, and tarsal tunnel syndrome.

In a function report dated June 2, 2020,[13] Ms. Hughes stated that she had a painful herniated disc in her neck that caused left arm problems. She stated that carpal tunnel surgery left her hands weak, causing her to drop things. She said she had difficulty getting comfortable and sleeping. She claimed that she needed help washing and styling her hair, putting on her socks, and sometimes getting out of bed. She stated that she could not use a knife and prepared only one meal each day in the form of sandwiches or frozen foods. She stated that she could not turn her head and, consequently, could not drive. She claimed an inability to lift more than ten pounds and claimed that squatting, bending, and standing hurt her back. She estimated that she could walk for only five to ten minutes before needing to rest. She was taking Omeprazole, Venlafaxine Hcl, Ibuprofen 800 mg, Oxycodone, and HCTZ, with side effects of sleepiness and interference with her ability to function.

---

[11]    Rec. Doc. 12-1 at 286-292.

[12]    Rec. Doc. 12-1 at 276-281, 347-361.

[13]    Rec. Doc. 12-1 at 212-219.

An MRI of Ms. Hughes's lumbar spine, obtained on July 6, 2018, showed degenerative changes at L3-L4 and L4-L5[14] suggesting nerve impingement, annular fissure, and chronic L4 and L5 spondylolysis without associated listhesis.

An MRI of her lumbar spine obtained on December 19, 2018,[15] showed a left foraminal protrusion at L3, annular tears at L4-L5, foraminal stenosis, and nerve root impingement.  An x-ray obtained the same day showed mid to lower lumbar disc space narrowing and slight retrolisthesis of L3 on L4.[16]

On December 7, 2019, Ms. Hughes was consultatively examined by Allison Alessandra, D.O.[17]  Ms. Hughes reported that her low back pain began after she sneezed four to five years earlier and progressively worsened.  She reported achy pain on the left side of her back, going down her leg, along with left foot numbness following a fall about a year earlier.  She claimed that the pain occurred daily, worsened with prolonged sitting, but was managed with Gabapentin.  She also reported intermittent knee instability.  Her past medical history included asthma, bilateral carpal tunnel syndrome, gastroesophageal reflux disease, depression, and left Achilles tendonitis.  She had undergone gall bladder removal, right carpal tunnel

---

[14]     Rec. Doc. 12-1 at 587-588.

[15]     Rec. Doc. 12-1 at 325-326.

[16]     Rec. Doc. 12-1 at 327.

[17]     Rec. Doc. 12-1 at 342-345.

release, cartilage repair of her left wrist, gastric sleeve surgery, and two C-sections. She was taking Gabapentin, Venlafaxine HCl, HCTZ, Omeprazole, Flonase, and Albuterol. She reported that she could perform activities of daily living including bathing, grooming, dressing, light housework, and short, targeted shopping. She was 5'2" tall and weighed 245 pounds. She was right hand dominant and did not use an assistive device for ambulation.

Examination showed that she was tender to palpation over the bilateral lower lumbar paraspinal muscles, the left piriformis muscle, at L5-S1, and at the right sacroiliac joint. She had a normal gait, could rise from a sitting position with mild difficulty, and was able to stand and walk on heels and tiptoes. She was mildly unsteady on an unassisted tandem walk, able to bend unassisted without difficulty, and only able to squat with assistance. Her grip strength, fine motor function, dexterity, and ability to grasp objects were normal bilaterally. Although she had normal tone and strength in all muscle groups in both lower extremities and no abnormal reflexes, light touch discernment was diminished over her left lateral thigh.

Dr. Alessandra's diagnoses were low back pain with radicular symptoms and history of asthma. She opined that Ms. Hughes was able to sit for a full workday with routine breaks, hold a conversation, respond appropriately to questions, and carry out and remember instructions. She opined that Ms. Hughes could walk or stand for fifteen to thirty minutes and lift up to twenty pounds. In her opinion, Ms.

Hughes's back pain was associated with her obesity. She stated that "weight loss would be expected to provide symptomatic benefit." Additionally, she noted that Ms. Hughes's asthma might restrict her ability to perform some tasks while "sedentary to low-activity levels are expected to be generally well-tolerated."

Ms. Hughes saw Dr. Malcolm Stubbs on January 16, 2020[18] for bilateral wrist pain. She reported a right carpal tunnel release in 2013 and left wrist arthroscopy in 2012.[19] EMG/NCV testing showed recurrent right median nerve entrapment neuropathy at the level of the carpal tunnel and left median nerve entrapment neuropathy at the level of the carpal tunnel with probable C6 radiculopathy.[20]

On January 29, 2020,[21] she complained to Dr. David Muldowny of neck and bilateral arm pain. She had been treated for similar neck issues six to seven years previously. X-rays showed spurring and calcification at C4-C5 and C5-C6. She was diagnosed with degeneration of cervical intervertebral discs and prescribed Tramadol and physical therapy.

---

[18]     Rec. Doc. 12-1 at 389-392.

[19]     Rec. Doc. 12-1 at 418.

[20]     Rec. Doc. 12-1 at 416-417.

[21]     Rec. Doc. 12-1 at 375-377.

She had bilateral carpal tunnel release surgery on February 18, 2020.[22]  When she saw Dr. Stubbs again on March 30, 2020, she complained that her symptoms were unchanged and her left hand was painful, weak, and swollen.[23]

An April 15, 2020, an MRI of her cervical spine[24] showed disc bulging at C5-C6 with slight flattening of the ventral cervical cord and mild to moderate canal and moderate left foraminal stenosis.

Ms. Hughes saw Dr. Stubbs again on April 27, 2020.[25]  While the pain in her right wrist had resolved, she appeared to be in distress due to pain.  Her left wrist was swollen and painful, and her left thumb also hurt.  In Dr. Stubbs's opinion, she was showing classic radiculopathy symptoms in the left C6 nerve distribution.

She saw Dr. Muldowny two days later,[26] and again on May 7, 2020 when he administered a cervical epidural steroid injection at C7-T1.[27]  On May 11, she told Dr. Stubbs that the injection did not provide much relief.[28]

---

[22]     Rec. Doc. 12-1 at 382-384, 419-420.

[23]     Rec. Doc. 12-1 at 405-407.

[24]     Rec. Doc. 12-1 at 379-380.

[25]     Rec. Doc. 12-1 at 408-411.

[26]     Rec. Doc. 12-1 at 365-368.

[27]     Rec. Doc. 12-1 at 369-370.

[28]     Rec. Doc. 12-1 at 412-415.

On May 19, 2020, Ms. Hughes underwent a hysterectomy.[29]  At a visit with Dr. Muldowny the next day, Ms. Hughes rated her neck and arm pain at seven out of ten, with radiation into the left arm and numbness and tingling in her right thumb.[30]  Dr. Muldowny recommended cervical surgery.

A week later, on May 27, 2020,[31] Ms. Hughes again visited with Dr. Muldowny regarding her low back pain, which she related to a motor vehicle accident in July 2018 and rated at five out of ten.  Although she had recently had a hysterectomy and was planning to have neck surgery soon, she asked Dr. Muldowny if she should have lumbar surgery at the same time.  Dr. Muldowny suggested that she consider lumbar epidural steroid injections versus surgery.

Dr. Muldowny performed cervical surgery on July 30, 2020.[32]  The procedure was an anterior cervical diskectomy with fusion ("ACDF") at C5-C6 and C6-C7 with allograft bone and plating.   At her post-operative appointment with Dr. Muldowny,[33] Ms. Hughes complained of neck and arm pain as well as issues with her voice.  Dr. Muldowny found no evidence of loosening of the instrumentation.

---

[29]     Rec. Doc. 12-1 at 458-465.

[30]     Rec. Doc. 12-1 at 528-531.

[31]     Rec. Doc. 12-1 at 532-535.

[32]     Rec. Doc. 12-1 at 514-521, 572-574.

[33]     Rec. Doc. 12-1 at 544-547.

On August 31, 2020,[34] Ms. Hughes complained to Dr. Stubbs of left shoulder pain and paresthesia and weakness in her left hand and thumb.  In his opinion, she was still experiencing residual radicular symptoms from C6 and had not yet completely healed from the cervical surgery.  He ordered physical therapy.

On September 22, 2020,[35] Ms. Hughes reported to Dr. Muldowny that she was having left shoulder pain radiating to her left hand and thumb.  The pain was relieved by Ibuprofen and exacerbated by activity and lifting.  Her voice was strained and hoarse.  However, her neck pain was resolved – she rated it at zero out of ten.  She had a full range of motion and full strength in her upper extremities.  X-rays showed that the ACDF was satisfactorily aligned at C5-C6 and C6-C7.  Dr. Muldowny suggested that she have her vocal cords evaluated.  He did not think her thumb pain was related to her neck but was instead related to the carpometacarpal joint.  She reported that physical therapy had not helped.

When Ms. Hughes saw Dr. Stubbs on October 5, 2020,[36] she complained of continued left thumb pain.  In his opinion, her shoulder pain was more cervical in nature.  He ordered an EMG/NCV to rule out recurrent carpal tunnel syndrome.

---

[34]     Rec. Doc. 12-1 at 548-551.

[35]     Rec. Doc. 12-1 at 662-665.

[36]     Rec. Doc. 12-1 at 556-559.

On October 6, 2020, Ms. Hughes saw Dr. John W. Alldredge, an ear, nose, and throat specialist.[37]  She was having difficulty swallowing, hoarseness, and left ear pain.  Examination showed an immobile right true vocal cord as well as left temporomandibular joint disorder.

Ms. Hughes complained to Dr. Muldowny of low back and leg pain on October 20, 2020.[38]  She reported that her symptoms were alleviated by Gabapentin, changing position, and modifying her activities but worsened with sitting and standing.  She requested more aggressive treatment.  Dr. Muldowny recommended an updated lumbar MRI and adjusted her medications.

An EMG/NCV test of Ms. Hughes's left arm on October 27, 2020, showed persistent median nerve entrapment neuropathy at the level of the carpal tunnel with significant denervation in the abductor pollicis brevis but minimal C6 changes without a clear-cut radicular pattern.[39]

On October 29, 2020, Ms. Hughes underwent surgery on her right vocal cord, which was performed by Dr. Alldredge.[40]

---

[37]     Rec. Doc. 12-1 at 597-599.

[38]     Rec. Doc. 12-1 at 560-563.

[39]     Rec. Doc. 12-1 at 568-569.

[40]     Rec. Doc. 12-1 at 654-655.

On November 2, 2020, Ms. Hughes saw Dr. Stubbs again.[41]  He discussed the recent EMG/ENV test results and recommended revision carpal tunnel release on her left wrist.

On November 6, 2020, Ms. Hughes saw Dr. Alldredge for a post-operative check-up.[42]  She had no pain, and she was improving.

On November 8, 2020, Ms. Hughes underwent another left carpal tunnel release surgery, performed by Dr. Stubbs.

On December 14, 2020, Ms. Hughes testified at a hearing regarding her symptoms and her medical treatment.  She stated that she had asthma as a child that worsened as she got older, with exacerbations of symptoms two to three times per month.  She stated that she took maintenance medication and inhaled steroids and used a rescue inhaler.

She testified that she was considering having surgery on her low back but her doctor was requiring her to have physical therapy first.  She claimed that her back pain radiated primarily to her left leg and foot.  She stated that standing for thirty minutes to an hour was difficult, requiring her to sit down.  She also stated that she had pain after sitting for thirty minutes to an hour, resulting in alternating between sitting, standing, and walking during the day.  She testified that she had to lay down

---

[41]      Rec. Doc. 12-1 at 564-567.

[42]      Rec. Doc. 12-1 at 600-601.

for a couple of hours daily to readjust and rest.  She stated that she wore a walking boot on her left foot two to three days each month to help the pain in her foot that came from her back.  She estimated that her pain was so bad two to three days per week that she could not get out of bed

Although Ms. Hughes testified that she was right hand dominant and her left hand was worse than her right one, she stated that she continued to have trouble reaching and grasping.  Despite the cervical surgery, she testified that she still had trouble turning her head and said that the surgery had resolved only some of her pain.  Despite the carpal tunnel surgery, she stated that she had limited use of her left thumb.  She testified that she had braces for her hands that she used during the day if she was having excessive pain and at night in order to sleep.

Ms. Hughes testified that she drove only short distances, that her husband assisted her with bathing, washing her hair, dressing, fastening buttons, lacing her shoes, and putting on her socks.  She stated that she could prepare simple meals but had trouble using a knife.  She stated that she had difficulty putting on makeup, fixing her hair, and writing well.  She stated that she could not use a keyboard.  Ms. Hughes testified that, despite having throat surgery, her voice was still impaired approximately twenty days out of the month.

Ms. Hughes now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[43] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[44] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[45]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[46] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[47] Conflicts in

---

[43]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[44]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[45]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[46]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[47]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[48] and credibility assessments[49] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the court in determining whether substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[50]

## B. <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[51] A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[52] A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but

---

[48]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[49]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[50]    *Wren v. Sullivan*, 925 F.2d at 126.

[51]    See 42 U.S.C. § 423(a). See, also, *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019).

[52]    42 U.S.C. § 1382c(a)(3)(A).

cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[53]

## C.    <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[54]

Before going from step three to step four, the claimant's residual functional capacity[55] is evaluated, by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[56]  The claimant's residual functional capacity is used at the fourth step to determine if he

---

[53]    42 U.S.C. § 1382c(a)(3)(B).

[54]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[55]    20 C.F.R. § 404.1520(a)(4).

[56]    20 C.F.R. § 404.1545(a)(1).

can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[57]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[58]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[59]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[60]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[61]

## D.   **The ALJ's Findings and Conclusions**

At step one, the ALJ found that Ms. Hughes has not engaged in substantial gainful activity since July 12, 2018, which is supported by substantial evidence in the record.

---

[57]   20 C.F.R. § 404.1520(e).

[58]   *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[59]   *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[60]   *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[61]   20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

At step two, the ALJ found that Ms. Hughes has the following severe impairments: asthma, degenerative disc disease of the cervical and lumbar spine, bilateral carpal tunnel syndrome (since January 2020), and obesity. This finding is supported by substantial evidence in the record.

The ALJ found, at step three, that Ms. Hughes has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Ms. Hughes did not challenge this finding.

The ALJ found that Ms. Hughes has the residual functional capacity to perform sedentary work except for the following: she is limited to lifting and carrying ten pounds occasionally, less than ten pounds frequently; limited to frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, or scaffolds, but no limitations in balancing; limited to frequent stooping, kneeling, crouching, or crawling; and limited to frequent reaching, handling, or fingering bilaterally. Due to respiratory problems, she is also limited to occasional exposure to fumes, odors, dusts, gases, and poor ventilation.[62] The claimant challenged this finding.

At step four, the ALJ found that Ms. Hughes is not capable of performing any past relevant work. This finding was not challenged.

---

[62]     Rec. Doc. 12-1 at 19.

At step five, the ALJ found that the claimant was not disabled from July 12, 2018, through January 25, 2021 (the date of the decision) because there are jobs in the national economy that she can perform.[63]  Ms. Hughes challenged this finding.

## E.    **The Allegations of Error**

Ms. Hughes contends that the ALJ erred by using an inappropriate standard to evaluate the consistency of her reported symptoms with the evidence in the record, resulting in an incorrect residual functional capacity finding.

## F.    **Did the ALJ Properly Evaluate Ms. Hughes's Residual Functional Capacity?**

Ms. Hughes argued that the ALJ erred in using an inappropriate standard to evaluate her residual functional capacity.  A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[64] The ALJ is responsible for determining a claimant's residual functional capacity.[65] In making such a finding, the ALJ must consider all evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the claimant's ability to work despite any physical and mental

---

[63]    Rec. Doc. 12-1 at 24.

[64]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[65]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

limitations.[66]  The ALJ must consider the limitations and restrictions imposed by all of the claimant's impairments, even those that are not severe.[67]

Under SSR 16-3p,[68] which generally tracks the statutory language of 20 C.F.R. §§ 404.1529 and 416.929, an ALJ must analyze a claimant's subjective complaints under a two-step process.  First, the ALJ must determine whether there is a medically determinable impairment that could reasonably be expected to produce the plaintiff's alleged symptoms.  Then, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which the claimant's symptoms limit his or her ability to perform work-related activities.  The following consistency standard is set forth in the statutes:

> In determining whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms *can reasonably be accepted as consistent* with the objective medical evidence and other evidence. . . .  We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms *can reasonably be accepted as consistent* with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work. . . .[69]

---

[66]    *Martinez v. Chater*, 64 F.3d at 176.

[67]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545(e)).

[68]    Social Security Ruling 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (October 25, 2017) ("SSR 16-3p").

[69]    20 C.F.R. § 404.1529(a), 416.929(a) (emphasis added).

In other words, the claimant's subjective complaints must be reasonably consistent with the objective evidence in the record.[70]

In this case, the ALJ cited the appropriate standard, the relevant statutes, and the relevant Social Security Ruling in his decision. He stated that, in making his residual functional capacity ruling, "the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."[71] The ALJ then went on to say this:

> the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not *entirely* consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.[72]

Based on the inclusion of this sentence in the ALJ's ruling, Ms. Hughes argued that the ALJ imposed a more stringent standard than that articulated in the statutes and in Social Security Ruling 16-3p, requiring that her symptoms be *entirely* consistent

---

[70]    *Brannon v. U.S. Commissioner of Social Security*, No. 6:21-CV-02306, 2022 WL 2165634 (W.D. La. May 24, 2022); *Aguero v. Saul*, No. 3:18-CV-3342-BH, 2020 WL 1493551, at *10 (N.D. Tex. Mar. 26 , 2020) (citing *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987).

[71]    Rec. Doc. 12-1 at 19.

[72]    Rec. Doc. 12-1 at 19 (emphasis added).

with other evidence in the record rather than *reasonably* consistent with the evidence in order to support a finding that she is disabled.

The sentence at issue in the ALJ's ruling is boilerplate language found in virtually every ruling in which Social Security disability benefits are denied. Black's Law Dictionary defines the term "boilerplate" as "ready-made or all-purpose language that will fit in a variety of documents" and "fixed or standardized contractual language that the proposing party often views as relatively nonnegotiable."[73]  While it would perhaps be wise for the continued use of this language – particularly the word "entirely" – to be reconsidered by the persons drafting rulings for ALJs, its use in the ALJ's decision in this case is not a statement of the standard that was applied nor was it a signal that the ALJ had applied a more stringent standard than required by the relevant statutes.  It is simply an acknowledgment that there are inconsistencies between the subjective symptoms described by the claimant and the other evidence in the record.  Indeed, this same argument has been raised and rejected in other cases.[74]

---

[73]    Boilerplate, Black's Law Dictionary (Ninth Edition, 2004).

[74]    See, e.g., *Hensley v. Saul*, No. 5:18-CV-00653, 2019 WL 5616927, at *7 (W.D. La. July 30, 2019), report and recommendation adopted, 2019 WL 3821811 (W.D. La. Aug. 14, 2019).

A symptom is the individual's own description or statement of his or her physical or mental impairments.[75]  An individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.[76]  However, if an individual alleges impairment-related symptoms, the ALJ must evaluate those symptoms using the two-step process set forth in the regulations.  Before Social Security Ruling 16-3p superseded Social Security Ruling 96-7p in 2016, ALJs were required to evaluate each claimant's credibility; thereafter, the use of the term "credibility" was eliminated from the process for evaluating an individual's subjective symptoms.  Now, in determining whether an individual is disabled, the ALJ must consider all of the claimant's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record.

In this case, it is clear that the ALJ credited Ms. Hughes's statements regarding her symptoms to the extent that they were consistent with the objective medical and other evidence.  For example, the ALJ found that she had severe impairments not claimed in her application for benefits.  She alleged that she was disabled by asthma, pinched nerve on left side, pinched nerve on right side, and Achilles tendonitis left foot, while the ALJ found that her asthma, degenerative disc

---

[75]    See 20 C.F.R. §§ 404.1528(a) and 416.928(a).

[76]    SSR 16-3p.

disease of the cervical and lumbar spine, bilateral carpal tunnel syndrome, and obesity were all severe impairments. The ALJ's decision includes a detailed summary of Ms. Hughes's medical records and notes, in particular, that none of Ms. Hughes's physicians have restricted her activities in a manner that would preclude all work. This Court's review of the record demonstrates that Ms. Hughes's complaints in her function report and hearing testimony differ from – and therefore are not consistent with – the objective medical findings of her treating physicians, the objective medical findings of the consultative examiner, and the symptoms she reported to them. For example, Ms. Hughes stated at the hearing that cervical surgery had cured only some of her neck pain, which is inconsistent with her report to her doctor that her neck pain completely resolved after surgery. Further, her description of impairments to her neck, arms, and hands are not consistent with the doctors' evaluation and observation of her strength, tone, and range of motion. These are merely examples of the inconsistencies in the record, and this Court has made no effort to weigh the evidence. Instead, this Court points out these examples to show that there is substantial evidence in the record supporting the ALJ's conclusion regarding Ms. Hughes's residual functional capacity.

An ALJ is not required to follow formalistic rules when assessing a claimant's subjective complaints.[77]  It is sufficient for the ALJ to include in his ruling specific references to the evidence and specific reasons for his findings showing that the relevant regulatory factors were considered.[78]

While it would have been prudent for the ALJ to have deviated from the boilerplate language and stated that he found that Ms. Hughes's statements concerning the intensity, persistence, and limiting effects of her symptoms were not reasonably – rather than not entirely – consistent with the medical and other evidence in the record, the choice of words used in that one sentence was not so erroneous as to mandate reversal of the ALJ's decision or to require remand of this action for further administrative action.  This Court finds that the ALJ applied the appropriate legal standards and further finds that substantial evidence in the record supports his residual functional capacity ruling.  Therefore, the ruling should be affirmed.

## **Conclusion and Recommendation**

For the reasons fully discussed above, this Court recommends that the Commissioner's decision should be AFFIRMED, and this matter should be dismissed with prejudice.

---

[77]      See *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).

[78]      *Jones v. Saul*, No. 3:19-CV-0880-BH2020 WL 5752390, at *22 (N.D. Tex. Aug. 24, 2020), report and recommendation adopted, 2020 WL 5747873 (N.D. Tex. Sept. 25, 2020) (citing *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005)).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[79]

Signed in Lafayette, Louisiana, this 21st day of June 2022.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[79] See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).